# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### Eastern Division (Cleveland)

**Inez Nieves** and **Betsy Ramos**, on behalf of themselves and all others similarly situated,

*Plaintiffs,*

v.

**Lorain County Board of Commissioners**; **Craig Snodgrass**, in his official capacity as Lorain County Auditor; **Lorain County Land Reutilization Corp.**; and, **Lorain County Port Authority**,

*Defendants,*

&

**State of Ohio**,

*Intervenor-Defendant.*

Case Number: 1:24-cv-01861

**SECOND AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

1.      The Fifth Amendment to the U.S. Constitution, incorporated against the States and their municipalities through the Fourteenth Amendment, prohibits the government from taking private property without paying just compensation to the property's owner.

2.      For over a decade, Lorain County has violated this prohibition.

3.      The violation proceeds as follows. First, people or businesses fall behind on paying their property taxes—often, only a few thousand dollars in back taxes. The

1

County then takes the land via a tax deed and transfers the property via the State to its county land bank. The land bank then sells the property to a private buyer. The prior owners lose their entire interest in the property, such that a few thousand dollars in taxes results in the forfeiture of tens or hundreds of thousands of dollars in land value. That surplus value—the difference between the taxes owed and the fair market value of the property—is never returned to the former owner.

4.      The U.S. Supreme Court recently held, unanimously, that this practice of seizing the surplus value in connection with property taken to satisfy a tax lien violates the Fifth Amendment's Takings Clause. *Tyler v. Hennepin County*, 598 U.S. 631 (2023). More particularly, though the taking of the property to satisfy delinquent taxes is itself legal, the failure to provide just compensation for the surplus value beyond the delinquent taxes is unconstitutional.

5.      The victims of that policy are most often poor, elderly, and vulnerable. Stealing the surplus value from these individuals is not just unconstitutional, it is unconscionable.

6.      This lawsuit seeks redress for these unconstitutional, uncompensated takings. More precisely, this suit seeks relief on behalf of a class of all victims of the Defendants' property value theft.

7.      The class-action mechanism provides a clean, efficient vehicle for judicial resolution of the hundreds of individual claims that would otherwise clog the courts.

8.      It is time to end the practice of institutionalized property-value theft and to justly compensate many property owners in Lorain County who were victims of this practice.

## PARTIES – PLAINTIFFS

9.      Inez Nieves is a natural person resident in Lorain County, Ohio.

10.     Betsy Ramos is a natural person resident in Lorain County, Ohio.

11.     Plaintiffs, and all others similarly situated, were victims of institutionalized theft by the Defendants.

## PARTIES – DEFENDANTS

12.     Lorain County Board of Commissioners is responsible for Lorain County. *See* O.R.C. § 305.12. The County Board is the employer of Mr. Snodgrass and others who administer its tax scheme.

13.     Mr. Snodgrass is auditor of Lorain County and is sued in his official capacity. As auditor, he is the responsible official for implementing the tax forfeiture policies of the County.

14.     The Lorain County Land Reutilization Corp. ("Land Bank") was incorporated by the Lorain County Board of Commissioners under Chapter 1724 of the Ohio Revised Code. It may buy, sell, lease, and mortgage property in its own name and can sue or be sued in its own name. Its statutory purpose is to assist in "the reclamation, rehabilitation, and reutilization of vacant, abandoned, tax-foreclosed,

or other real property within the county for whose benefit the corporation is being organized." O.R.C. § 1724.01(B)(2)(a).

15. The Lorain County Land Reutilization Corp. is a component unit or operator of the Lorain County Port Authority.

16. The State of Ohio intervened as a Defendant.

17. Acting under color of state law and pursuant to its own policy choices, the Defendants violated the rights of Plaintiffs and all others similarly situated (the plaintiff class) by stealing the value in their property over and above the amounts legally owed for back property taxes.

## JURISDICTION & VENUE

18. Jurisdiction exists under 28 U.S.C. § 1331 because the Plaintiffs and the proposed Plaintiff Class are individual persons (and their estates and heirs) and entities (such as limited liability companies or corporations) bringing claims under the U.S. Constitution for violations of their civil rights by a local government. *See* 42 U.S.C. § 1983.

19. Jurisdiction for the declaratory relief is further appropriate under 28 U.S.C. § 2201(a).

20. Venue is appropriate in the Northern District of Ohio under 28 U.S.C. §1391(b)(1) & (2) because the Plaintiffs are residents of the Northern District of Ohio, the properties they formerly owned are in the Northern District of Ohio, and the Defendants are in the Northern District of Ohio.

## FACTS

**21.**     Betsy and Inez owned a home together at 125 W. 29th St., Lorain, OH 44055. They first bought the home in May 2006.

**22.**     The modest home, built in 1900, has four bedrooms, one full bathroom, and is located in downtown Lorain.

**23.**     The home and underlying property have a market value of $71,930, according to the County Assessor (Defendant Snodgrass), and an assessed value of $25,180. *See* Exhibit 9, Lorain County Auditor's property report for parcel 0201003203008.[1] Zillow assigns the property a value of $93,900.[2] Redfin assigns it

---

[1] For the court's convenience, the following is a full list of exhibits:

1. Lorain County "Vacant Land Application," from the County's website

2. Lorain County "Land Bank FAQs," from the County's website

3. Lorain County "Land Disposition Policy," from the County's website

4. Lorain County "Available Parcels," from the County's website

5. Lorain County Land Bank Website

6. Judgment Entry of Forfeiture for Parcel 0201003203008

7. Auditor's Deed for Parcel 0201003203008

8. Quit Claim Deed for Parcel 0201003203008

9. Auditor's Property Report for Parcel 0201003203008

10. Lorain County Prosecutor's Letter of April 17, 2025

11. Plaintiffs' letter of February 28, 2025, to the Lorain County Treasurer

[2] https://www.zillow.com/homedetails/125-W-29th-St-Lorain-OH-44055/34533996_zpid/

a value of $115,407.[3]

24.    Like many people struggling to make ends meet, Betsy and Inez fell behind on paying their property taxes. The taxes on the home were modest, only $1,453.14 in tax year 2022. *Id.*

25.    Nevertheless, when they fell behind on their taxes, the County took their entire home. In March 2022, the County initiated judicial proceedings to foreclose on the home. At the time of the foreclosure, Betsy and Inez owed $15,830.44, including accrued taxes, delinquencies, assessments, penalties, interest, and charges.

26.    On June 22, 2022, and July 6, 2022, the Sheriff of Lorain County put the property up for sale on open auction dates. No one bid the minimum required.

27.    As a result, the failure to sell resulted in forfeiture of the property under O.R.C. § 5723.01 to the State of Ohio. Exhibit 6.

28.    On October 26, 2022, Lorain County executed the transfer of the property from Betsy and Inez to the State.

29.    Forfeiture to the State, however, is just a technical stop along the real road to the ultimate destination. Even after forfeiture to the State, Lorain County retains practical responsibility for determining what to do with the property.

30.    Lorain County and its Land Bank have a policy and practice of doing one of two things with forfeited lands. Some lands the County sells to the general public

---

[3] https://www.redfin.com/OH/Lorain/125-W-29th-St-44055/home/66118679

in an auction by the Auditor. That annual sale takes place in September. This year 35 properties were on the list, with back taxes owed as low as $210.05.[4] Ohio Revised Code Chapter 5723 sets out a process for sales of such lands forfeited to the state. *See, e.g.*, O.R.C. § 5723.05 (explaining that the sales involve "lands forfeited to the state").

31.     Other properties the County turns over to its county land bank, the Lorain County Land Reutilization Corp.[5] The Land Bank could be considered functionally an arm of the county, or alternatively, it could be considered to make its own policy choices.

32.     This transfer from County to State to Land Bank has implications under Ohio law. In particular, O.R.C. § 5722.04(D) provides that "any lands otherwise forfeited to the state for want of a bid at the foreclosure sale may, upon the request of a county land reutilization corporation, be transferred directly to the corporation without appraisal or public bidding." After that transfer occurs, Chapter 5723 is no longer relevant, for any subsequent disposition of the property by the land bank is governed by Chapter 5722, and the property no longer appears on the forfeited lands list of properties for sale under O.R.C. § 5723.04. *See* O.R.C. § 5722.15(A)

---

[4] https://auditor.loraincounty.com/auditor/cms/files/File/Auditors%20Land%20Sale/2024/2024%20Auditor%20Land%20Sale%20and%20Rules.pdf

[5] *See* Lorain County Land Bank FAQs (Exhibit 2): "Lorain County Land Bank will sometimes choose to hold property that has potential to be redeveloped; either because it is contiguous to other Land Bank owned property, has economic development or potential for public purpose." https://oh-loraincounty.civicplus.com/DocumentCenter/View/534/Land-Bank-FAQs-PDF

(explaining that when a land bank receives "land under section 5722.03 or 5722.04 of the Revised Code, the county auditor shall remove from the auditor's tax lists and duplicates all taxes, assessments, charges, penalties, and interest that are due and payable on the land at the time of the sale in the same manner as if the property had been sold to any other buyer at the foreclosure or forfeiture sale"). For purposes of Chapter 5723, including O.R.C. § 5723.11 governing the disposition of surplus when "forfeited lands are sold for a greater sum than the amount of the tax, assessment, penalty, interest, and costs of sale," the transfer of property from the State to the land bank generates no surplus that can be obtained by the original owner. *See* O.R.C. § 5723.04(B) ("[T]he land is deemed sold by the state for no consideration.").

33. According to the Defendants' website, "The Primary function of the County Land Bank is to serve as a facilitator for the return of vacant, abandoned, and tax foreclosed property to productive tax paying economic uses or to beneficial public uses." Exhibit 5.

34. Indeed, of the various ways that properties come into the land bank, most often it is through tax foreclosure (*i.e.*, forfeiture): "The Land Bank acquires properties through tax foreclosure, gifts, negotiated purchase, donations and Deed in lieu of foreclosure. The most common means will be tax foreclosure." Lorain

County Land Bank FAQs, Exhibit 2.[6] *Accord* Carissa Woytach, *Lorain County looks to tackle affordable housing in strategic plan*, The Chronicle-Telegram (May 14, 2024).[7]

35.     Though technically a separate non-profit corporation, the Land Bank is functionally an instrument of county government. It was created at the behest of the County Board. Of its five board members, four are county officials (the fifth is the mayor of Lorain). The County Administrator is its director, and its three staff members are the County ports director, the county assistant prosecutor, and the clerk of the County Board (who is the Land Bank's corporate secretary). Exhibit 5. Its day-to-day operations are run by the County Port Authority.

36.     When the Land Bank transfers property, it claims exemption from the real estate transfer fee as an instrumentality of government. The County exercises policy discretion under O.R.C. § 5722.04 to pick and choose which properties it wants to take through the Land Bank. The Land Bank also exercises policy discretion under O.R.C. § 1724.02 in performing its statutory duties.

37.     According to the court record in their foreclosure case, Betsy and Inez's home is one property that was tax foreclosed, forfeited to the state for lack of bids under O.R.C. Chapter 5723, then transferred into the Land Bank under O.R.C.

---

[6] https://oh-loraincounty.civicplus.com/DocumentCenter/View/534/Land-Bank-FAQs-PDF
[7] https://chroniclet.com/news/391047/lorain-county-looks-to-tackle-affordable-housing-in-strategic-plan/

§ 5722.04. *See* Exhibit 7; *accord* Defendants Lorain County and Craig Snodgrass's Joint Motion to Dismiss, ECF 7, at 1.

38.　　The Land Bank listed the property for sale.[8] This sale was not governed by Ohio Revised Code Chapter 5723, including § 5723.11 about the disposition of any surplus from a Chapter 5723 sale. Chapter 5723 is "a statutory procedure established to sell forfeited lands for purposes other than land reutilization programs." 1991 Ohio Op. Att'y Gen. 2-143 (1991). Once "a deed to particular lands has been executed and delivered to [a land bank] pursuant to R.C. 5722.04, those lands are no longer forfeited lands and are not subject to sale under R.C. 5723.05." *Id.*; *see* O.R.C. § 5722.15(A).

39.　　Rather, the Land Bank's sale of the Plaintiffs' property was governed by Chapter 5722, which lets the land bank sell the property, O.R.C. § 5722.07, and retain "[a]ll proceeds from the sale" "without further reporting or accounting to the taxing districts," O.R.C. § 5722.08. *See generally* 2015 Ohio Op. Att'y Gen. No. 2015-005 (Feb. 11, 2015) (explaining the distinction between "the forfeiture statutes in R.C. Chapter 5723" and "the foreclosure statutes codified in R.C. Chapters 323, 5721, or 5722").

40.　　The Land Bank sold the property on July 24, 2024, to All American Home Renovations, LLC, which now owns it. Exhibits 8, 9, and 10.

---

[8] https://www.loraincountyohio.gov/DocumentCenter/View/3279/LCLRC--Available-Parcels-PDF?bidId=

41.     When the Land Bank sells property, it does so in accord with its "Land Disposition Policy." Any purchaser can purchase the property provided they meet certain basic criteria (like not having any tax debts themselves). Exhibits 1–3.

42.     According to the policy, "The following factors shall be taken into consideration when determining the appropriate sale price for all parcels: . . . ." Exhibit 3. The first factor is "[t]he market value currently assigned by the Lorain County Auditor." Exhibit 3. In this instance, the market value assigned by the Auditor, Mr. Snodgrass, is $71,930.

43.     Despite that policy, the Land Bank sold the property to All American for $5,000 on or about July 23, 2024. Exhibit 10.

44.     A taking in violation of *Tyler* occurred when the County took the entire property on behalf of the State and then transferred it to the Land Bank without providing Betsy and Inez with the difference between the taxes they owed and the property's fair market value. Had the property sold at auction, they would have been entitled by law to the difference between the sale price and the taxes owed. O.R.C. § 5721.20; *see* O.R.C. § 5723.11. Because the property did not sell initially, but was transferred via the State to the Land Bank, which then sold it to a house-flipper for cheap, the Plaintiffs receive nothing.

45.     To be clear, Plaintiffs do not challenge the foreclosure judgment as to their property. Their claim is that the Defendants took their property without furnishing

them just compensation for the surplus value of their property. *See generally Knick v. Twp. of Scott*, 588 U.S. 180 (2019) (takings claim accrues at time of taking).

46.     The Defendants exercise their policy discretion to transfer the property to the Land Bank without returning the surplus value to the property owner.

47.     On February 28, 2025, the plaintiffs, pursuant to court order, asked the Lorain County Treasurer by letter to pay them the difference between the property's sale price and the back taxes owed.  Exhibit 11. The Prosecutor, in a letter sent on behalf of the Treasurer, denied the request.  *See* Exhibit 10.

## PLAINTIFF CLASS

48.     A class action is the simple, efficient way to ensure that all Lorain County homeowners and small businesses that have been victims of this theft receive just compensation for the gross violation of their constitutional and legal rights.

49.     To that end, Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23, particularly Rule 23(a) and (b), on behalf of the following Class:

> All persons, natural and legal, and their successors and heirs, who meet the following criteria: (1) they owned or were the beneficial owners of real property in Lorain County; (2) their property was subject to a tax forfeiture by the county; (3) the property did not sell at a tax auction and so was forfeited; (4) the fair market value of the property at the time of forfeiture exceeded the full amount of taxes, fees, interest, and charges owed on the property.

50.     Plaintiffs believe that the Class can be ascertained on a consistent, fair, all-properties basis. The only information necessary would be the taxes and fees owed

(which the Defendants would know) and the fair market value of the property at the time of foreclosure (which can be determined and applied on a classwide basis using a formula or method or database validated in an expert report).

51.    Excluded from the Class is any judge or magistrate presiding over this case and their family members and staff. Plaintiffs reserve the right to modify the class definition as the case unfolds and further facts are discovered.

52.    Upon information and belief, the Plaintiff Class includes hundreds of people and companies whose homes or business properties were taken through a tax deed and pushed into the Land Bank. The most recent data available indicates that Lorain County has 216 properties for sale through the Land Bank (Exhibit 4)[9], and has had similar numbers for the past decade. Bringing such suits individually would clog the courts, whereas a single class proceeding would result in an efficient adjudication, such that the requirement of numerosity is met. The information as to who belongs to the class and their contact information can be discerned from data held by the Defendants.

53.    There are questions of law and fact common to all members of the Class. All have been subject to the same process laid out by Ohio law and the Defendants' policies.

54.    The questions of law are common across the Class:

---

[9] https://www.loraincountyohio.gov/DocumentCenter/View/4198/LCLRC--Available-Parcels-PDF?bidId=

- Does the Defendants' policy of executing a tax deed where surplus value was not returned to the property owner constitute a taking without just compensation under the Fifth Amendment?

- Does the Defendants' policy of imposing punitive sanctions in the form of seized surplus value far in excess of the back taxes owed violate the Eighth Amendment?

55.     The questions of fact are also simple: Were the Class members stripped of their property by a county tax deed? And did the fair market value of their property exceed the back taxes and interest owed on the property?

56.     Once the law and facts are resolved, the question is simply how to return to the Plaintiff Class the amount stolen from them by the Defendants.

57.     The claims are typical across the entire class: all members of the Plaintiff Class were the victims of the same policies administered by the Defendants.

58.     Plaintiffs will fairly and adequately protect the interests of the Class. All Plaintiffs are members of the Class. Plaintiffs have no interests adverse to the interests of the Class. Plaintiffs are committed to prosecuting this action and have retained competent, experienced counsel who have had substantial success prosecuting class action cases and claims based on constitutional law.

59.     Questions of law or fact common to the Class predominate over questions affecting individual members of the class, as the only individualized question—the size of the surplus taken from any given class member—can be quickly and easily determined applying the expert report to the County's data.

60.    A class action is the optimal vehicle to fairly and efficiently resolve the question of property value theft for its victims in Lorain County. The alternative is dozens or hundreds of individual lawsuits, which would clog the courts. Moreover, such lawsuits are unlikely to the extent that the Plaintiff Class is overwhelmingly composed of low-income and elderly residents and those for whom English is a second language, such that the class action is the optimal vehicle for achieving justice for the greatest number of persons. A class action ensures all victims of property theft are justly compensated without burdening the courts or Defendants with numerous lawsuits.

## DAMAGE TO PLAINTIFF CLASS BEYOND THE STOLEN VALUE

61.    Home ownership is a core pillar of the American dream. Home ownership is correlated with physical health, mental and emotional health, financial prosperity, a secure retirement, and a solid family life. *See* Luke A. Munford, et al., *Is owning your home good for your health? Evidence from exogenous variations in subsidies in England*, 39 Economics and Human Biology 100903 (2020).

62.    When members of the Plaintiff Class lose their entire home value, they are literally forced out on the streets with nothing. It is virtually impossible for them to move into a new home when they have zero money for a down payment after all their equity has been stolen by their government. They end up in apartments, on the couches of friends and neighbors, or on the streets. Their children are forced to move schools, and their entire lives are disrupted. The loss of a home to foreclosure

correlates to mental and emotional strain, a decline in physical health, a decline in academic achievement for students in the home, and a multi-generational loss of wealth. *See* Alexander C. Tsai, *Home foreclosure, health, and mental health: a systematic review of individual, aggregate, and contextual associations*, 10 PloS one e0123182 (April 7, 2015).

63.     Loss of a home is not just about its immediate effects: it is also about the loss of dignity. Homeownership is a mark of pride, of responsible membership in the community, of citizenship in a neighborhood, of stake in a place. It represents a tremendous blow to a person's standing in the community to be forced out on the street after a foreclosure. Gregory S. Alexander, *Property, Dignity, and Human Flourishing*, 104 Cornell L. Rev. 991 (2019).

64.     The same is true for those who lose commercial properties. An owner-occupied duplex, a family-run restaurant, or a small business already live on the narrowest of margins. The loss of all value in a commercial property can bankrupt a small business. The owner of that business has to lay off employees, cancel vendor contracts, and stop serving customers. An entire community is affected.

## UNCONSCIONABLE BEHAVIOR BY DEFENDANTS

65.     The Defendants' cavalier attitude towards the constitutional rights and human dignity of the Plaintiff Class is outrageous, displaying a consistent indifference that shocks the conscience. For starters, one would think it obvious that intentional government-organized theft on a massive scale would be wrong, plain and simple.

16

But numerous academic and advocacy reports made Ohio state and local governments aware that their policies were outrageous and especially damaging to their most vulnerable populations: the elderly, communities of color, and those who speak English as a second language. Yet they chose to persist in these policies even knowing of their effects.

66.     One of the nation's premier academic experts in this area finds "greed and cruel indifference to their victims" pervasive in the tax foreclosure industry. Andrew W. Kahrl, *Unconscionable: Tax Delinquency Sales as a form of dignity taking*, 92 Chicago-Kent L. Rev. 905, 932 (2017). As Professor Andrew Kahrl of the University of Virginia points out in an article for the Chicago-Kent Law Review, "Because minority neighborhoods have historically been subject to discriminatory overtaxation and lower property values as result of segregation and 'redlining,' African American homeowners have been and remain more vulnerable to predatory tax buying." He continues, "Tax buying has inflicted a significant, if underappreciated, economic toll on black America. It contributed, in no small measure, to the precipitous decline of black landownership over the second half of the twentieth century (from over 15 million acres in 1910 to 2.3 million acres in 1997), prevented African American communities from becoming partners in and beneficiaries of real estate development in some of America's most vibrant markets, accelerated the deterioration of urban minority neighborhoods and stymied efforts at recovery, and exacerbated the racial wealth gap. It has also left deep emotional scars on victims,

robbing them of their dignity in the course of taking—or threatening to take—their property."

67.     "To homeowners facing eviction, predatory tax buying was a cruel, vicious, indeed unconscionable, act." *Id.* at 923. He concludes, "It is unconscionable, but perhaps not surprising, that many states allow private investors to take someone else's property and all of its equity over a debt that often originates from an accident or oversight." *Id.* at 933.

68.     Institutionalized value theft preys upon the elderly in particular. A 2012 report from the National Consumer Law Center notes, "Homeowners most at risk are those who have fallen into default because they are incapable of handling their financial affairs, such as individuals suffering from Alzheimers, dementia, or other cognitive disorders." *The Other Foreclosure Crisis*, Nat. Consumer Law Center (July 2012).[10]

69.     Institutionalized value theft also disproportionately affects communities of color. An article from the Center for Community Progress notes, "In many communities, delinquent property tax enforcement systems also unfairly burden communities of color. In Baltimore, investigative reporters recently found that properties in the city's majority-Black census tracts have tax liens that are sold at much higher rates than minority-Black census tracts. In Washington, DC, investigative

---

[10] https://www.nclc.org/wp-content/uploads/2022/09/tax-lien-sales-report.pdf

reporters found that Black homeowners disproportionately lost their homes to tax foreclosure and researchers have found that tax foreclosures can contribute to gentrification by displacing homeowners of color." Libby Benton, *Delinquent Property Tax Enforcement Could Be the Missing Piece in Fighting Vacant Properties*, Center for Community Progress (Feb. 21, 2023).[11]

70.     Bloomberg reports similarly that "Generations of Black Americans lost their land to tax liens." Margaret Newkirk, Bloomberg (June 29, 2022).[12]

71.     Finally, upon information and belief, Defendants have continued executing tax deeds in the wake of *Tyler*. The State of Ohio has not changed its statutes in the wake of *Tyler*. Any tax deed foreclosure that stole property value after May 25, 2023, the date that *Tyler* was issued, demonstrates utter and reckless disregard for the constitutional rights of persons in the Plaintiff Class.

## CLAIMS

### *Count I: The Defendants have an established policy and practice of taking property without just compensation in violation of the U.S. Constitution.*

72.     Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

---

[11] https://communityprogress.org/blog/delinquent-property-tax-enforcement-could-be-the-missing-piece-in-fighting-vacant-properties/

[12] https://www.bloomberg.com/news/features/2022-06-29/tax-liens-cost-generations-of-black-americans-their-land

73.     The Fifth Amendment to the U.S. Constitution, as incorporated against the States by the Fourteenth Amendment, forbids counties to take property without just compensation. As the Supreme Court held in *Tyler*, a taxing authority effects an uncompensated (and thus unconstitutional) taking when, it keeps the surplus value after enforcing a tax lien.

74.     Here, the Defendants took property from the Plaintiffs and the class members by retaining surplus value at the point of taking.

75.     Under *Tyler*, the taking and retention of that surplus value violates the Fifth Amendment's Takings Clause.

76.     The surplus value taken from the Plaintiff Class must be returned to them by the Defendants.

77.     The emotional, psychological, and physical health effects of the loss of one's home are also damages that should be rectified.

78.     That taking is a violation of constitutional rights subject to recompense under Section 1983.

### Count II: The Defendants have an established policy and practice of imposing excessive fines and forfeitures in violation of the U.S. Constitution.

79.     Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

80.     The Defendants are barred by the Eighth Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, from imposing excessive fines.

81.     The Defendants' policy choices to take the surplus value from delinquent property taxpayers are, at least in part, a punitive policy designed to punish lawbreakers and to disincentivize others from lawbreaking.

82.     Excessive fines are disproportionate fines. *See Timbs v. Indiana*, 586 U.S. 146, 153 (2019).

83.     "[T]he Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense. . . . a fine is unconstitutionally excessive under the Eighth Amendment if its amount is grossly disproportional to the gravity of the defendant's offense." *Pimentel v. City of Los Angeles*, 966 F.3d 934, 937 (9th Cir. 2020) (cleaned up). The Clause applies not only to criminal forfeitures, but also civil forfeitures and municipal fines. *Id.*

84.     The Supreme Court, in its seminal modern case on excessive fines, considered an instance where a traveler attempted to board an international flight with $357,144, in violation of the federal law requiring reporting of any transportation of more than $10,000 outside the United States. *Id.* (discussing *United States v. Bajakajian*, 524 U.S. 321 (1998)). The Supreme Court found it an excessive fine to impose a forfeiture of the entire $357,144 that Mr. Bajakajian attempted to transport.

85.     Here, the single offense of failure to pay property taxes, which may go as low as a few hundred dollars, results in a sanction equivalent to the entire fair market value of a property, which may reach millions of dollars. This is unconstitutionally disproportionate in violation of the Eighth Amendment's excessive-fines clause.

86.     Plaintiffs forfeited four or more times the cost of their unpaid taxes, in the gap between their taxes owed and the fair market value of their property.

87.     Plaintiffs represent the overall experience of the Plaintiff Class, that the Defendants consistently imposed forfeitures far in excess of the underlying amounts involved.

88.     18 U.S.C. § 1983 allows for the recovery of damages from these Defendants for violations of federal constitutional rights.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Plaintiff Class, respectfully request that the Court:

89.    Certify the Plaintiff Class, designate the Plaintiffs as representatives of the Plaintiff Class, and appoint the undersigned as Class Counsel;

90.    Pursuant to the Declaratory Judgment Act (28 U.S.C. §2201 and Fed. R. Civ. Proc. 57), provide relief by declaring that the policy of uncompensated seizure of surplus value in property by the Defendants is unlawful under the Fifth Amendment to the U.S. Constitution;

91.    Pursuant to the Declaratory Judgment Act (28 U.S.C. §2201 and Fed. R. Civ. Proc. 57), provide relief by declaring that the punitive policy of uncompensated seizure of surplus value in property by the Defendants is unlawful as an excessive fine under the Eighth Amendment to the U.S. Constitution;

92.    Award Plaintiffs and the Plaintiff Class just compensation for the unconstitutional taking of their property, namely the difference between the back taxes and interest owed and the fair market value of their property;

93.    Award Plaintiffs and the Plaintiff Class just compensation for the unconstitutional excessive fines imposed, namely the difference between the back taxes and interest owed and the fair market value of their property, with interest;

94.    Award the Plaintiffs and Plaintiff Class nominal damages for the violation of their federal constitutional rights;

**95.** Award the Plaintiffs and the Plaintiff Class reasonable attorney's fees and costs, as provided by law;

**96.** Grant the Plaintiffs and the Plaintiff Class such other relief as is just and proper to recognize their claims and protect their rights to just compensation and appropriate damages.

Respectfully submitted,

*/s/ Joseph P. Ashbrook*
Benjamin M. Flowers (OH# 0095284)
Joseph P. Ashbrook (OH# 0091279)
Ashbrook Byrne Kresge Flowers LLC
PO Box 8248
Cincinnati, OH 45249
Phone: 513-201-5775
Fax:  513-216-9882
bflowers@abkf.com
jpashbrook@abkf.com

Daniel R. Suhr
        *(admitted pro hac vice)*
Hughes & Suhr LLC
747 N. LaSalle St., Suite 210
Chicago, IL 60654
Phone: 414-588-1658
dsuhr@equitylawsuit.com

Christopher E. Mills
        *(admitted pro hac vice)*
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
Phone: 843-606-0640
cmills@spero.law

## CERTIFICATE OF SERVICE

I certify that, on May 16, 2025, I caused the foregoing to be served on all parties through the Court's e-distribution system.

*/s/ Joseph P. Ashbrook*
Benjamin M. Flowers (OH# 0095284)
Joseph P. Ashbrook (OH# 0091279)
Ashbrook Byrne Kresge Flowers LLC
PO Box 8248
Cincinnati, OH 45249
Phone: 513-201-5775
Fax: 513-216-9882
bflowers@abkf.com
jpashbrook@abkf.com
